### Norfolk & W. Ry. Co. v. Barney.
### Same v. Betterton Coffee Co.

(Decided Jan. 21, 1936.)

F. M. RIVINUS, O. T. HINTON and HOMER E. HOLT for appellant.

LEWRIGHT BROWNING and J. J. MOORE for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

About 8 o'clock in the evening of February 9, 1932, an automobile driven by the appellee George H. Barney collided with the appellant's locomotive at a grade crossing in Kenova, W. Va. On a joint trial he recovered a judgment of the appellant for $1,600 for personal injuries sustained, and the appellee Betterton Coffee Company, owner of the automobile, recovered judgment for $250 for damages to it. Appeals have been prosecuted from those judgments and are disposed of in one opinion.

Sixteenth street, which is a part of the United

States Highway No. 60, runs east and west, and a short distance east of the entrance to the bridge across the Big Sandy river to Catlettsburg, Ky., is intersected by appellant's belt line or switch serving several industries north of the highway. About 200 feet east of the crossing, the street slightly turns. About 100 feet away it widens and divides, another street diverging in a southwesterly direction. In the fork of the "Y" thus formed was a large electric sign, and a gasoline filling station also well lighted. The street had a series of lights on standards on each side of it. The highway bridge also had numerous similar lights. Off on the north side of the street is an embankment 8 or 10 feet high, but gradually declining and becoming level about 100 feet east of the railroad crossing. From that point, there is a free and unobstructed view of the railroad track on the north, so that a traveler can clearly see a train 400 feet or more as he approaches the crossing. The highway was very heavily traveled, while the use of the railroad switch track was infrequent.

Barney was traveling west, and a locomoitve and six cars were running south. Barney testified that he was driving about 20 miles an hour and keeping a lookout ahead and on either side as he approached the crossing with which he was familiar. His car windows were closed and its lights dimmed or focused downward. He did not hear any signal or warning and did not see the train until just as the engine loomed up in front of him about 15 feet away. He applied his brakes, which were in good condition, but struck the engine about the cylinder while it was moving, he thinks. He was knocked unconscious and knew nothing further until several hours later, when he came to in the hospital. A witness located the point of collision as near the center of the street from the appearance of the markings thereon. The engine was stopped before it completely crossed over the street. Barney testified that the numerous lights in front and to his side caused reflections and "blind spots." Counsel suggests that the condition was something like where one is in a brightly lighted room and is endeavoring to see into the outer darkness. It was conclusively shown, however, that the headlight of the engine was burning, so the situation is not exactly analogous, for the engine light must have been conspicuous in the

darkness and the topography and situation were such that one observing ordinary care was bound to have seen it unless the engine was at the immediate edge of the street so that its lights shown across and ahead of the traveler.

One of the specific acts of negligence relied on and submitted to the jury was the defendant's failure to give proper signals of the approach of the train. The trainmen, a policeman, and two other disinterested witnesses testify that the train was moving at a speed of from 3 to 5 miles an hour and that the usual crossing whistle was sounded when it was three or four car lengths north of the street crossing. Also, that about the time it entered the intersection there were two short blasts of the whistle, which was in accordance with custom. The fireman saw the automobile coming, perhaps 80 feet away, but he expected it would stop, as there was sufficient time and space for it to do so. However, he called a caution signal (indicating a possibility of danger) as the locomotive went upon the crossing. The engineer shut the throttle and after proceeding a little way, upon another signal from the fireman, he stopped the train within 4 feet. The bell was ringing continuously from the time the whistle was first blown.

We have only the negative testimony of the plaintiff that he did not see the headlight or hear the signals. He does not undertake to say they were not given. It may well be accepted that his failure to see and hear was due to the multiplicity of lights (for which the defendant was not responsible; see Public Service Co. of Ind. v. Schneider's Adm'r, 260 Ky. 334, 85 S.W.(2d) 676) and his closed windows. The defendant proved that the plaintiff approached the crossing at a speed of from 30 to 40 miles an hour, and that an automobile of similar kind by test could be stopped in 14 feet when running 20 miles an hour, and in 45 feet when running 35 miles an hour.

The trial was held, and our decision must rest upon West Virginia law as pleaded and proved. Stewart's Adm'x v. Bacon, 253 Ky. 748, 70 S. W. (2d) 522. A statute of that state (section 3104, West Virginia Code) requires that a locomotive bell or whistle shall be rung or blown at a distance of at least 60 rods from a street or highway crossing, and be kept ringing or whistling

for a time sufficient to give due notice of the approach of the train. A failure to observe such provisions makes the railway company responsible for damages sustained by reason of such negligence. In the instant case, the train started from a point about 800 feet away, so there could have been no literal compliance with the law requiring the signals to begin 60 rods, or 990 feet, away without backing up and then coming forward. That was, of course, not required; the purpose of the statute as therein expressed being that the signals should be given "for a time sufficient to give due notice of the approach of such train before such street or highway is reached." Bowles v. Chesapeake & O. R. Co., 61 W. Va. 272, 57 S. E. 131; Coil's Adm'x. v. C., St. L. & N. O. R. Co., 232 Ky. 33, 22 S. W. (2d) 428; Central Texas & N. W. Ry. Co. v. Nycum (Tex. Civ. App.) 34 S. W. 460. It is admitted that the signals were not begun until the train was within three or four car lengths of the crossing, which would be about 150 feet. Taking the engine's speed of 4 miles an hour and the automobile's speed of 20 miles an hour (the plaintiff's evidence), it was about 750 feet from the crossing when the whistle first sounded. This, obviously, was sufficient warning under the circumstances, and the blowing of the whistle sooner would have served no purpose. Indeed, Barney had stopped for a street light a block away. Coil's Adm'x v. C., St. L. & N. O. R. Co., supra. There remains in the case on this aspect of negligence in the matter of audible signals only the evidence of the plaintiff that he heard nothing. We pass over the question whether under the West Virginia law this was sufficient to carry the question to the jury; also, the contention that the dangerous conditions obtaining at night at this crossing were such that the jury was properly allowed to say whether or not other measures for warning the traveling public were required in the exercise of ordinary care on the part of the railway company.

The other species of negligence relied upon was that it had been the custom and practice of the defendant to have a watchman at the crossing to give warning of the approach of trains; that plaintiff knew of and relied upon that custom and practice on this occasion, but there was no watchman there. He testified that during the twelve years or more he had been traveling this way he had seen such a watchman on every occa-

sion when a train or cut of cars came across. This, however, was only ten or fifteen times. One or two witnesses sustained him. But it was established by numerous witnesses that the practice was when a cut of cars was being backed over the street for a member of the crew to precede it for the purpose of warning travelers on the highway, but it had never been done when the locomotive was in front pulling the cars, because the engine men were in position to see those on the highway. Such was the situation here.

The evidence of a police officer is important on this point. He had alighted from a street car at the crossing and his attention was attracted by the whistle and bell of the locomotive. He saw the automobile about 120 feet away, coming at a speed of 35 or 40 miles an hour and, when he noted that it was not slackening speed and was not going to stop, he ran into the street, waving a lighted flashlight and holloing to Barney, trying to flag him down. There was ample time and distance in which to have stopped, but the automobile came on and crashed into the side of the locomotive after it had come to a stop. It is obvious Barney did not see or hear this warning.

The parties offered in evidence several statutes of West Virginia and decisions of the Supreme Court of that state. There is no question raised here that the instruction as to contributory negligence based thereon was not a correct submission of the law of that state, so we may accept it in determining whether as a matter of law the facts justified or required a peremptory instruction for the defendant. The law as thus defined is in substance that it was the duty of the plaintiff Barney on this occasion to exercise ordinary care to learn of the approach of the train and avoid collision with it, and "for that purpose to look and listen at such point as he approached said crossing where he could learn of the approach of a train by so looking and listening, and to keep his car under such control that he could stop before entering upon the crossing should a train be discovered on or approaching the same." The further duty was placed upon the plaintiff if his view of the crossing at a distance of 100 feet therefrom was obstructed in any way so as to prevent him from seeing a distance of 400 feet in the direction from which the train approached, then to reduce the speed of his

car to at least 15 miles an hour and not exceed that speed at any point within 100 feet of the crossing. Also, if the jury believed the crossing was more than ordinarily dangerous, or that a view of the approach of a train was obstructed by lights or embankments or any other object, then "it was incumbent upon the plaintiff to exercise increased care to avoid a collision commensurate with such danger, if any." Then followed the advice that if the plaintiff had failed to perform any or all of those duties and the collision occurred as the direct result, no recovery could be awarded him because of his contributory negligence. City of Elkins v. Western Maryland R. Co., 76 W. Va. 733, 86 S. E. 762, 1 A. L. R. 198; Bonar v. Baltimore & Ohio Ry. Co., 91 W. Va. 462, 113 S. E. 766; Robertson v. Monongahela Power & R. Co., 99 W. Va. 356, 128 S. E. 829; Lester v. Norfolk & Western R. Co., 111 W. Va. 605, 163 S. E. 434, 435; Morris' Adm'x v. B. & O. Ry. Co., 107 W. Va. 97, 147 S. E. 547.

The lights on the street are to be considered only in relation to the degree of danger at the crossing, for the defendant was not responsible for them. It was the plaintiff's contention throughout that their existence made it a dangerous crossing at night. The interference with vision by those lights, as the plaintiff testified, made it his duty to exercise care and vigilance proportionate to the danger and to conform the use of his faculties to avert injury in degree to the particular conditions and circumstances. One cannot drive blindly and escape the consequences. Hammond v. Morrison, 90 N. J. Law, 15, 100 A. 154; Downing v. Baucom's Adm'x, 216 Ky. 108, 287 S. W. 362; Norfolk & W. Ry. Co. v. Hensley's Adm'r, 252 Ky. 347, 67 S. W. (2d) 510; Cf. Louisville & Interurban Ry. Co. v. Bedford's Adm'r, 203 Ky. 583, 262 S. W. 941; Public Service Co. v. Schneider's Adm'r, supra. In Lester v. Norfolk & Western Ry. Co., supra, where it was contended that the driver of an automobile could not ascertain the danger because of fog, the court answered that the condition of the weather and the approaching darkness were such circumstances as increased the danger and required the plaintiff to employ more vigilance; if he did not stop he did not exercise ordinary care for his own safety, and even if he had stopped he failed reasonably to employ his faculties and senses in ascertaining the impending danger. "If he had looked properly he

must have seen the train which had come into dangerous proximity of the crossing and which, according to the testimony of his own witnesses, was visible for a distance of more than 100 feet.'' Barney insisted he had looked ahead and to the right and left until he got to the crossing and saw no train. He listened and heard none. If his view was obscured for more than 100 feet before reaching the railroad track, as he says, the statute placed the duty upon him not to travel faster than 15 miles an hour; yet the plaintiff admits that he was running about 20 or 25 miles an hour.

If the danger were less, it was the plaintiff's duty under the West Virginia law in any event to look and listen, and to keep his car under such control that he could stop it before entering upon the crossing should the train be discovered on or approaching it. If he looked, he could have seen, and if he saw and took chances of beating the train over the crossing, he was negligent. If he looked and did not see the danger, he is chargeable with negligence in failing to see what was plainly visible. Huddy's Ency. of Automobile Law, vol. 7-8, p. 60; Jameson v. N. & W. R. Co., 97 W. Va. 119, 124 S. E. 491; Lester v. Norfolk & Western Ry. Co., supra; Louisville & N. R. Co. v. Hurst's Adm'r, 220 Ky. 402, 295 S. W. 458.

As to the warning of a watchman at the crossing, which the plaintiff testified he relied upon, we think the policeman effectually performed that service. His warnings went unheeded, due undoubtedly to plaintiff's failure to see or hear him, for one does not deliberately avoid warnings of such peril. But it is the law of West Virginia and some other states that the fact that occasionally a trainman engaged in switching acts as a flagman at a crossing does not excuse one from looking and listening at the crossing when no flagman was there. Casdorph v. Hines, 89 W. Va. 448, 109 S. E. 774; Bonar v. Baltimore & Ohio Ry. Co., supra; Huddy, vol. 7-8, p. 81.

What has been said in relation to looking and listening for the train itself is applicable to the failure to see or hear this warning when reliance is had upon a practice to have a watchman at the crossing.

We have been regarding the case of the appellee Barney, for that of the other appellee rests upon and is determinable by it.

It is our opinion that the trial court should have directed a verdict for the defendant in each case. Huddy, vol. 7-8, p. 30.

Judgment reversed